IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

GABRIEL RALPH REYES,

    Plaintiff,

  v.

MICHAEL SAYRE, MD, et al.,

    Defendants.

Case No.: C 13-0620 CW (PR)

ORDER GRANTING DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Doc. nos. 27, 30-32

Plaintiff Gabriel Ralph Reyes, a state prisoner currently incarcerated at California State Prison—Sacramento, filed this <u>pro se</u> civil rights action pursuant to 42 U.S.C. § 1983, alleging constitutional violations by four individuals employed at Pelican Bay State Prison (PBSP), where he was previously incarcerated. Specifically, Plaintiff claims that a fourteen-day discontinuance of Tylenol #3, which caused him to have withdrawal symptoms, constitutes deliberate indifference to his serious medical needs. Defendants filed four separate motions for summary judgment, which are fully briefed. For the reasons discussed below, Defendants' motions for summary judgment are GRANTED.

BACKGROUND

The following facts are from Plaintiff's verified complaint and opposition and the parties' declarations and exhibits. Except where noted, the facts are undisputed.

I. Dr. Williams

Plaintiff suffers from several chronic medical conditions, including chronic pain. Williams Decl. ¶ 6; Reyes Decl. ¶ 2. For his chronic pain, Plaintiff has been prescribed both narcotic and non-narcotic medications and a pain patch. Id. Since April 21, 2009, Defendant Dr. Claire Williams, who was Plaintiff's primary care provider (PCP), prescribed for Plaintiff's pain Tylenol #3 with Codeine, two tablets twice a day. Id. ¶ 10. Codeine is an opioid that has a moderate potential for addiction. Id., Ex. G (California Prison Health Care Services 2009 Pain Management Guidelines) at 16.

On August 30, 2009, Plaintiff received a medical consultation with a pain management specialist, Dr. Capitano. Williams Decl. ¶ 8. Dr. Capitano recommended that Plaintiff be prescribed Trileptal, a non-narcotic pain medication, starting at 50 mg to a maximum of 600 mg per day. Id. On October 23, 2009, Dr. Williams reviewed Dr. Capitano's recommendations and added Trileptal, 50 mg a day, to Plaintiff's pain regimen. Id. ¶ 9. Dr. Williams continued to see Plaintiff for follow-up visits and increased the dosage of the Trileptal because Plaintiff reported that the lower dosage was not helping his pain. Id. ¶¶ 10-13.

On April 2, 2010, Dr. Williams again examined Plaintiff. Id. ¶ 14. Dr. Williams states that, prior to Plaintiff's visit, she learned that the California Department of Corrections and Rehabilitation (CDCR) had modified its statewide chronic pain medication protocol in an effort to curb the overuse of narcotic medications by inmates. Id. The new protocol involved limiting the use of narcotic medications, such as Tylenol #3, and substituting non-narcotic pain medications when medically

appropriate.  Id.  In accordance with this protocol, Dr. Williams increased Plaintiff's Trileptal to 400 mg three times a day for pain control, cancelled his prescription for Tylenol #3 and scheduled a follow-up visit in two weeks.  Id.; Reyes Decl. ¶ 11. Dr. Williams' medical note for this visit states, "The use of Tyl. #3 was discontinued by Sacramento so he is here for an alternate treatment plan."  Williams Decl., Ex. A at 453.  Plaintiff disputes that there was such a new pain management protocol because Dr. Williams does not submit it as evidence.

Plaintiff states that, at his April 2, 2010 follow-up visit, Dr. Williams told him that she was decreasing his Tylenol #3 pursuant to orders from Dr. Sayre, who, at that time, was Chief Medical Officer (CMO) at PBSP.  Reyes Opp. ¶ 9.  Plaintiff states that he told Dr. Williams that he needed Tylenol #3 to manage his chronic pain and that his current regimen of medications was the best he had experienced.  Reyes Decl. ¶ 12.  Plaintiff also reminded Dr. Williams that he had been taking a high dose of Tylenol #3 for a long time and, because of this, he was worried about withdrawal symptoms and requested that she slowly reduce the Tylenol #3.  Id. ¶ 13.  According to Plaintiff, Dr. Williams replied, "I'm sorry, my hands are tied.  The CMO is in charge. . . I have an email from him ordering me to cancel your medication," and also said that she was not going to give Plaintiff anything for withdrawal symptoms because, "that's the consequences of long term use of Narcotic Pain Medication, now your [sic] just going to have to pay the Piper."  Id. ¶¶ 13, 15.

In her declaration, Dr. Williams states that the reason she discontinued Plaintiff's Tylenol #3 was because of the new state protocol, but she does not specifically dispute Plaintiff's

3

statements that she said Dr. Sayre ordered her to discontinue Plaintiff's Tylenol #3 or that she told Plaintiff that withdrawal symptoms were the consequences of his use of Tylenol #3. Williams Decl. ¶ 14.

Immediately after Dr. Williams discontinued Plaintiff's Tylenol #3, Plaintiff experienced pain and withdrawal symptoms such as muscle cramps, loss of appetite, vomiting, severe diarrhea, hallucinations, loss of sleep and hot and cold flashes. Reyes Decl. ¶ 20. Plaintiff suffered like this for approximately fourteen days. Id. ¶ 23. Plaintiff lost weight and was exhausted physically and mentally. Id.

After forty-eight hours of suffering from withdrawal symptoms, Plaintiff submitted a health care request form seeking medical help. Id. ¶ 17. In response to this request, on April 5, 2010, Plaintiff was seen by Registered Nurse (RN) Heather Williams. Id. ¶ 19. RN Williams noted that Plaintiff looked strange and stated, "Reyes, are you OK? Can you sit up?" Id. RN Williams left the room to consult with Dr. Adams. Id. at Ex. G., RN Williams' Progress Notes. When RN Williams returned, she prescribed medication for Plaintiff's nausea and regular Tylenol for Plaintiff's fever and pain. Id. ¶ 19. Plaintiff received a two-day prescription, which did not help his symptoms. Id.

On April 16, 2010, fourteen days after Dr. Williams discontinued Plaintiff's Tylenol #3 prescription, Dr. Williams saw Plaintiff again and re-prescribed Tylenol #3. Id. ¶ 24. According to Plaintiff, Dr. Williams stated, "It was a mistake to take you off your medication the way that it was done." Id. That night, Plaintiff received the same dosage of Tylenol #3 he had been receiving before Dr. Williams discontinued it. Id.

4

Dr. Williams states that, when she saw Plaintiff on April 16, 2010 for a follow-up visit, he told her that his chronic pain was not adequately controlled, that he was experiencing pain in his upper back and arms and decreased sensation in his right fingertips and that the increase in Trileptal had not helped him. Williams Decl. ¶ 15. Dr. Williams states that, clinically, she did not observe any adverse effects from the discontinuance of Tylenol #3 for two weeks but, given Plaintiff's indication that he was in pain, she decreased his Trileptal to 200 mg a day and restarted him on Tylenol #3. Id. In her medical progress note, Dr. Williams wrote, "The restrictions on Tyl. #3 have been lifted and it is now up to the PCP if he wants to use it for long term pain so I will decrease his Trileptal back to 200 mg . . . and restart his Tyl. #3 at two BID." Id., Ex. A at 487.

Dr. Williams states that, based upon her examination of Plaintiff, his clinical presentations, her review of his record and the nature of his chronic pain symptoms, the medical care he received for his chronic pain complaints was proper and appropriate. Id. ¶ 16.

II. Medical Guidelines

In support of his claims, Plaintiff submits the 2009 Pain Management Guidelines from the State of California Prison Health Care Services. Reyes Decl., Ex. G. Plaintiff cites page 8, which indicates, "Physical dependence is a common feature of opioids, corticosteroids, barbiturates, benzodiazepines and anti-hypertensive's," and that "physical dependence is easily managed by gradually tapering the drug if it is no longer needed." Ex. G at 8. Plaintiff points to other guidelines which urge the tapering of drugs that no longer meet treatment goals. See e.g.,

5

Ex. G at 13, 24, 36 ("If a patient has been on a significant dose of opioid for more than a couple of weeks, when discontinuing consider short taper of opioid to avoid withdrawal symptoms."). The guidelines indicate that Codeine has a moderate addiction potential. Id. at 16.

III. Dr. Sayre

Plaintiff states that, on April 2, 2010, Dr. Sayre, in his role as CMO, instructed Dr. Williams to discontinue Plaintiff's Tylenol #3. Reyes Decl. ¶¶ 13-15. Dr. Sayre declares that he did not participate in Dr. Williams' April 2, 2010 decision to discontinue Plaintiff's Tylenol #3 and that he was not involved in Dr. Williams' decision to restart Plaintiff on Tylenol #3 two weeks later. Sayre Decl. ¶ 10.

IV. J. Torrance

On April 4, 2010, Plaintiff submitted an Inmate Health Care Appeal Form (602 appeal) seeking relief from the pain and withdrawal symptoms he was experiencing. Reyes Decl. ¶ 32. J. Torrance, a Licensed Vocational Nurse, and the Medical Appeal Coordinator, screened out Plaintiff's 602 appeal on the ground that it was duplicative of two previous 602 appeals Plaintiff had filed. Id.

Torrance cites the California Code of Regulations to explain that she can screen out a 602 appeal if it "duplicates an inmate's previous appeal upon which a decision has been rendered or is pending." Torrance Decl. ¶ 5 (citing California Code of Regulations (CCR), tit. 15, § 3084.6(c)(2)). She cites another regulation providing that a 602 appeal can be screened out if "the appeal issue or complaint emphasis has been changed . . . to the the extent that the issue is entirely new, and the required lower

6

levels of review and assessment have been circumvented." Id. (citing CCR, tit. 15, § 3084.6(b)(16)).

Torrance states that, on April 4, 2010, Plaintiff submitted his 602 appeal about the cancellation of his Tylenol #3 in which he requested that he (1) be given relief; (2) be given proper pain medication; (3) be given a written explanation of why the Tylenol #3 had been cancelled; and (4) be compensated for his pain and suffering. Id. ¶ 6. On April 12, 2014, Torrance reviewed Plaintiff's 602 appeal. Id. ¶ 7. She noted that Plaintiff's 602 appeal history included two prior 602 appeals, filed on September 8, 2008 and December 17, 2009, where he also complained that he was dissatisfied with his chronic pain management medication. Id. ¶ 8. Torrance determined that Plaintiff's April 2010 appeal, which sought changes to his chronic pain medication, was duplicative of his prior 602 appeals and screened it out on that basis. Id. ¶ 12.

On April 15, 2010, Plaintiff resubmitted his April 4, 2010 602 appeal, contending it was not duplicative. Id. ¶ 13. Torrance noted Plaintiff's additional grounds for relief about his need for medication to counteract his withdrawal symptoms, and determined that it was a change in emphasis and a new issue in his appeal. Torrance screened out Plaintiff's amended appeal on this ground. Id.

On April 21, 2010, Plaintiff again resubmitted his April 4, 2010 appeal and Torrance advised Plaintiff that he must present the new issues in a separate 602 appeal form. Id. ¶ 14.

Plaintiff states that Torrance knew that this was the only 602 appeal that Plaintiff submitted regarding his withdrawal symptoms between April 2 and April 4, 2010 and, thus, it was

impossible for Torrance to think that it was a duplicate of any other 602 appeal. Id. Plaintiff states that Torrance had three opportunities to review, investigate and assess Plaintiff's medical situation and, in each instance, she chose to disregard Plaintiff's suffering, even after Plaintiff explained it to her. Id.

V. J. Walker

J. Walker was Chief of the Office of the Third Level Appeals-Health Care (OTLA) from July 1, 2009 to December 4, 2010 and is currently retired. Walker Decl. ¶ 1. As Chief of the OTLA, Walker was responsible for overseeing the review of Health Care Appeals at the third level of review and responded to inmate appeals after the inmate's specific institution had responded to the appeal at the second level of review. Id. ¶ 3. Decisions at the third level of review were approved by Walker or by a designated manager within the OTLA. Id.

Walker notes that Plaintiff's April 4, 2010 602 appeal was screened out three times at Plaintiff's prison as duplicative of previous appeals and that Plaintiff appealed this decision to the OTLA. Id. ¶ 11. On May 18, 2010, the OTLA reviewed Plaintiff's appeal, agreed it was duplicative of his previous appeals and also screened it out as not complying with CCR, title 15, section 3084.3(c)(2). Id., Ex. A at 893. Walker declares that, although his printed name, as Chief of the OTLA, appears on the OTLA decision, the review of Plaintiff's appeal was performed by an OTLA Associate Health Program Advisor, whose signature appears on the OTLA's decision. Id.[1] Walker declares that he was not

---

[1] The OTLA decision appears to be signed by D. Sanchez, for J. Walker, Chief. Walker Decl., Ex. A at 893.

8

involved in the decision regarding Plaintiff's 602 appeal and that he was not aware, prior to being served with this lawsuit, that Plaintiff had submitted a 602 appeal. Id.

Plaintiff states that Walker's name on the Third Level Screen-Out Form indicates that she was the person signing off on the decision to screen out his appeal and, thus, denied him the medical care he needed. Reyes Decl. ¶ 35. Plaintiff states that Walker was aware of the pain management guidelines that instructed the tapering of narcotic medications and, thus, she was aware of Plaintiff's suffering and did nothing to relieve it. Opp. ¶¶ 15-16.

DISCUSSION

I. Motion for Summary Judgment

A. Legal Standard

Summary judgment is only proper where the pleadings, discovery, and affidavits show there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

The court will grant summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the initial burden of identifying those portions of the record that

9

demonstrate the absence of a genuine issue of material fact.  The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324.

In considering a motion for summary judgment, the court must review the evidence in the light most favorable to the nonmoving party. Leslie v. Grupo ICA, 198 F.3d 1152, 1158 (9th Cir. 1999). The court's function on a summary judgment motion is not to make credibility determinations or weigh conflicting evidence with respect to a disputed material fact. T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A district court may consider only admissible evidence in ruling on a motion for summary judgment. Fed. R. Civ. P. 56(c); Orr v. Bank of America, 285 F.3d 764, 773 (9th Cir. 2002). A verified complaint may be used as an opposing affidavit under Rule 56, as long as it is based on personal knowledge and sets forth specific facts admissible in evidence. Schroeder v. McDonald, 55 F.3d 454, 460 & nn.10-11 (9th Cir. 1995).

B. Deliberate Indifference to Serious Medical Needs

Plaintiff argues Defendants were deliberately indifferent to his serious medical needs by completely discontinuing his Tylenol #3 prescription for fourteen days without tapering it off to prevent him from experiencing withdrawal symptoms.  He argues that Defendants were also deliberately indifferent by failing to prescribe any treatment for his withdrawal symptoms.

### 1. Deliberate Indifference Legal Standard

Deliberate indifference to serious medical needs violates the Eighth Amendment's proscription against cruel and unusual punishment. Estelle v. Gamble, 429 U.S. 97, 104 (1976); McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other grounds, WMX Technologies, Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc). A determination of "deliberate indifference" involves an examination of two elements: the seriousness of the prisoner's medical need and the nature of the defendant's response to that need. McGuckin, 974 F.2d at 1059.

A serious medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain. Id. The existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment, the presence of a medical condition that significantly affects an individual's daily activities, or the existence of chronic and substantial pain are examples of indications that a prisoner has a serious need for medical treatment. Id. at 1059-60.

A prison official is deliberately indifferent if he knows a prisoner faces a substantial risk of serious harm and disregards that risk by failing to take reasonable steps to abate it. Farmer v. Brennan, 511 U.S. 825, 837 (1994)(equating the standard with that of criminal recklessness). The prison official must not only "be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists," but he "must also draw the inference." Id. In order for deliberate indifference to be established, therefore, there must be a purposeful act or failure

to act on the part of the defendant and resulting harm. McGuckin, 974 F.2d at 1060.

Deliberate indifference may be shown when prison officials deny, delay, or intentionally interfere with medical treatment, or it may be shown in the way in which they provide medical care. Id. at 1062. Neither a difference of opinion between a prisoner-patient and prison medical authorities regarding treatment, nor a difference of medical opinion as to the need to pursue one course of treatment over another is sufficient to establish deliberate indifference. Toguchi v. Chung, 391 F.3d 1051, 1059-61 (9th Cir. 2004). In order to prevail on a claim involving choices between alternative courses of treatment, a plaintiff must show that the course of treatment the doctors chose was medically unacceptable under the circumstances, and they chose this course in conscious disregard of an excessive risk to the plaintiff's health. Id. at 1058. A claim of mere negligence related to medical problems is insufficient to state a deliberate indifference claim. Id.; Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

2. Analysis

Defendants do not argue that Plaintiff does not have a serious medical need for treatment for his chronic pain. Rather, they argue that the discontinuance of his Tylenol #3 prescription for fourteen days does not constitute deliberate indifference.

a. Defendant Williams

The following facts regarding Plaintiff's claim against Dr. Williams are undisputed: (1) Dr. Williams was treating Plaintiff for many chronic ailments, including pain; (2) since April 2009, Dr. Williams' treatment for Plaintiff's pain included Tylenol #3; (3) in August 2009, pain specialist, Dr. Capitano, recommended

12

Trileptal for Plaintiff's pain; (4) on April 2, 2010, Dr. Williams discontinued Plaintiff's prescription for Tylenol #3, increased his prescription for Trileptal and scheduled him for a two-week follow-up visit; (5) Dr. Williams was familiar with the fact that Codeine is an opioid that is moderately addictive and that Plaintiff could experience withdrawal symptoms from its complete discontinuance; (6) on April 5, 2010, Plaintiff told RN Williams that he was suffering from pain, nausea, fever and other withdrawal symptoms, and RN Williams consulted with Dr. Adams who prescribed regular Tylenol for Plaintiff's pain and medication for his nausea; and (7) on April 16, 2010, fourteen days after Dr. Williams discontinued Plaintiff's Tylenol #3, she re-prescribed it for him at the original dosage.

There are few facts regarding this claim that are disputed. The main one is whether Dr. Williams discontinued Plaintiff's Tylenol #3 on the basis of a new state protocol requiring her to do so. Dr. Williams' statements in her declaration and her medical notes of her meetings with Plaintiff on April 2 and April 16, 2010, support her claim that the state had issued a new protocol regarding discontinuing narcotic medications like Tylenol #3. However, as Plaintiff points out, Dr. Williams does not submit a copy of the state protocol. On Defendants' motion for summary judgment, Plaintiff's evidence must be taken in the light most favorable to him. Therefore, for purposes of this motion, the Court assumes that a new state protocol did not exist.

However, even if a new state protocol did not exist, Plaintiff's evidence has not raised a disputed issue of material fact regarding whether Dr. Williams' treatment constituted deliberate indifference.

13

Plaintiff's claim focusses on the fourteen days between April 2, 2010, when Dr. Williams' discontinued his Tylenol #3 and increased his Trileptal and April 16, 2010, when she resumed the Tylenol #3 and Trileptal at their previous dosages, during which time Plaintiff experienced withdrawal symptoms. However, two days after Dr. Williams discontinued the Tylenol #3, Dr. Adams treated Plaintiff for the withdrawal symptoms. Twelve days later, when Plaintiff informed Dr. Williams he was experiencing severe pain and withdrawal symptoms, she re-instituted his previous pain management regimen.

This evidence shows that on April 2, 2010, Dr. Williams was trying another treatment regimen for Plaintiff's pain, just as different pain treatment regimens had been prescribed for him in the past. Along with this change in regimen, she scheduled a follow-up visit in two weeks to evaluate it. When Dr. Williams saw that the new regimen did not work, she immediately reinstituted the old regimen. Thus, even though the new regimen did not work, the evidence shows that Dr. Williams' goal for the new regimen was to treat Plaintiff's pain in a different way, not to deny, delay or interfere with his treatment or to cause him increased pain. That Dr. Williams immediately reinstituted the original regimen when she saw the new regimen was not working is further evidence that she intended to treat Plaintiff's pain, not to deny him treatment.

Furthermore, the fact that Plaintiff wanted the Tylenol #3 to be tapered off rather than discontinued at once means that he had a difference of opinion with Dr. Williams. In order to prevail on a claim involving choices of alternate courses of treatment, Plaintiff must show that Dr. Williams' treatment plan was

14

medically unacceptable and chosen in conscious disregard of an excessive risk to his health. See Toguchi, 391 F.3d at 1059-61. Plaintiff's evidence fails to show this. The medical guidelines Plaintiff submits only suggest an opioid like Tylenol #3 should be reduced gradually; they do not require tapering. By scheduling a follow-up visit in two weeks, Dr. Williams ensured that she would be able to evaluate the results of the new regimen very soon after she implemented it, so that if it did not work, she would be able to change it, which she did. As stated above, Dr. Williams' actions demonstrate care and concern for Plaintiff, not deliberate indifference to his pain.

For all these reasons, Plaintiff has failed to raise a disputed issue of material fact that Dr. Williams' treatment constituted deliberate indifference to his serious medical needs. Dr. Williams' motion for summary judgment is granted.

### b. Other Defendants

Plaintiff's claim of deliberate indifference against Dr. Sayre is based upon Plaintiff's statement that Dr. Sayre ordered Dr. Williams to discontinue Plaintiff's Tylenol #3. Even taking Plaintiff's evidence against Dr. Sayre as true, his claim against Dr. Sayre fails because it is predicated upon his claim against Dr. Williams. In other words, Dr. Sayre's order to Dr. Williams to discontinue Plaintiff's Tylenol #3 does not constitute deliberate indifference because, in following that order and discontinuing the Tylenol #3, Dr. Williams was not deliberately indifferent to Plaintiff's medical needs. Dr. Sayre cannot be liable for ordering Dr. Williams to implement a medically appropriate treatment plan. Dr. Sayre's motion for summary judgment is granted.

Plaintiff's claims for deliberate indifference against J. Torrance and J. Walker fail for the same reason. The claims are predicated on the fact that these Defendants did not grant Plaintiff's appeals challenging Dr. Williams' fourteen-day discontinuance of his prescription for Tylenol #3. Because Dr. Williams was not deliberately indifferent to Plaintiff's serious need for chronic pain treatment by discontinuing his prescription of Tylenol #3, Torrance and Walker could not be deliberately indifferent by denying Plaintiff's 602 appeals about Dr. Williams' behavior.

Furthermore, Plaintiff's claims against Torrance and Walker fail for another reason. By the time Torrance and Walker denied Plaintiff's appeals about Dr. Williams' behavior, she had re-prescribed the Tylenol #3 so that there was no behavior for them to remedy. This situation is distinguishable from one in which there is an ongoing medical need and the inmate's appeal requests a remedy for the ongoing problem. In the latter case liability can be based on the denial of the appeal, just as it could be based on the denial of a verbal request from the inmate. See <u>Jett v. Penner</u>, 439 F.3d 1091, 1098 (9th Cir. 2006) (supervisor may be liable for deliberate indifference to a serious medical need if he or she fails to respond to a prisoner's request for help). Dr. Williams' fourteen-day discontinuance of Plaintiff's prescription for Tylenol #3 was not an ongoing medical need that could result in the officers' liability for denying Plaintiff's appeals. Therefore, Plaintiff's evidence against Torrance and Walker fails to raise a disputed issue of material fact on this ground as well. Torrance and Walker's motions for summary judgment are granted.

CONCLUSION

For the foregoing reasons, the Court orders as follows:

1. Defendants' motions for summary judgment are GRANTED. Docket nos. 27, 30-32.

2. The Clerk of the Court shall enter a separate judgment, terminate all motions and close the file.

3. This order terminates Docket nos. 27, 30-32.

IT IS SO ORDERED.

Dated: 9/8/2014

CLAUDIA WILKEN
UNITED STATES DISTRICT JUDGE